**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**RODERICK BROWN,**

    **Plaintiff,**

**v.**                                              **Civil Action No. 1:17cv144**
                                                    **(Judge Keeley)**

**UNITED STATES DEPARTMENT
OF JUSTICE; MARK S. INCH, Director,
Bureau of Prisons; RUBY MEMORIAL
HOSPITAL; MOHAMAD SALKINI; BARBARA
VON BLANCKENSEE, former Warden, FCI
Morgantown; JOHN F. CARAWAY, Regional
Director, BOP South Central Regional Office;
RENEE CROGAN, Retired Assistant Health
Services Administrator, FCI Morgantown;
TIMOTHY TOMPKINS, Case Management
Coordinator, FCI Morgantown; KENNETH
MONTGOMERY, Lieutenant, FCI Morgantown;
and BRIAN PLAVI, Correctional Counselor, FCI
Morgantown,**

    **Defendants.**

## REPORT AND RECOMMENDATION

### I. Introduction

On August 17, 2017, the *pro se* Plaintiff, a former federal inmate[1] initiated this case by

filing the instant Bivens[2] civil rights complaint. ECF No. 1. Along with his complaint, Brown filed

a motion to proceed as a pauper. ECF No. 2. By Order entered August 22, 2017, Brown was

granted permission to proceed as a pauper without payment of any portion of a filing fee. ECF No.

5.

---

[1] Plaintiff satisfied his sentence and was released from BOP custody on July 31, 2017. See ECF No. 43-1 at 3; ECF No 43-3 at 7.

[2] Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

On April 3, 2018, the undersigned conducted a preliminary review of the complaint, determined that summary dismissal was not warranted at that time, and directed the Defendants to answer the complaint. ECF No. 8. Plaintiff was given an additional thirty days in which to identify the Bureau of Prisons ("BOP") John Doe defendants; and the Clerk was directed to issue 60-day summonses and forward copies of the complaint to the United States Marshal Service ("USMS") to effect service of process upon the remaining named defendants. Id.

On April 17, 2018, Defendant Mohamad Salkini ("Salkini") filed a motion to dismiss with a memorandum in support.  ECF No. 12.

On April 19, 2018, Plaintiff filed a response, identifying the previously-unnamed BOP defendants.  ECF No. 13.  Plaintiff filed a supplemental response regarding the previously-unnamed BOP defendants on April 20, 2018, attaching a copy of a Freedom of Information Act ("FOIA") request and a copy of the Order to Answer. ECF No. 14.

On April 24, 2018, because Plaintiff was proceeding *pro se*, a Roseboro Notice was issued. ECF No. 17. On April 26, 2018, Defendant Ruby Memorial Hospital ("RMH") filed a Motion to Dismiss with an attached memorandum in support and a copy of its Corporate Disclosure Statement.  ECF Nos. 23, 24.  A second Roseboro Notice was issued on May 1, 2018. ECF No. 26.

On May 3, 2018, a second Order to Answer was issued to the newly-identified BOP defendants. ECF No. 27.

On May 18, 2018, Plaintiff filed a response in opposition to Defendant Salkini's Motion to Dismiss.  ECF No. 31.   On May 24, 2018, Plaintiff filed a response in opposition to Defendant RMH's Motion to Dismiss.  ECF No. 36. On May 31, 2018, Defendant RMH filed a reply. ECF No. 38.  On June 4, 2018, Plaintiff filed a Motion for Default Judgment against Defendant United

States Department of Justice "(DOJ"), Defendant Mark S. Inch ("Inch") and Defendant B. Von Blanckensee ("Von Blanckensee"). ECF No. 39.

On June 6, 2018, Defendants DOJ, Inch, Von Blanckensee, J.F. Caraway ("Caraway"), Renee Crogan ("Crogan"), T. Tompkins ("Tompkins"), and B. Plavi ("Plavi"), (collectively, "the Federal Defendants") filed a Motion to Substitute Defendants and Clarify Electronic Docket, to correct misspellings in several of their names. ECF No. 41.  By Order entered June 7, 2018, the Federal Defendants' Motion to Substitute Defendants and Clarify Electronic Docket was granted. ECF No. 42.

On June 11, 2018, the Federal Defendants filed a Motion to Dismiss with a memorandum in support, attaching a sworn declaration with attachments. ECF No. 43.  That same day, Plaintiff filed a Motion for Leave to File a Motion to Strike Defendant[] [Salkini's] Reply Brief to the Plaintiff's Response Motion and Plaintiff's Response to Defendant[] [Salkini] Reply Motion. ECF No.  44.  On June 12, 2018, a third Roseboro Notice issued.  ECF No. 45.

On June 19, 2018, Plaintiff filed a Motion to Compel Discovery. ECF No. 47. By Order entered the same day, Plaintiff's discovery motion was denied without prejudice as premature. ECF No. 49.

On June 21, 2018, Plaintiff filed a "Request for Leave to Reply to the Defendant[] [Salkini] Second Attempt at Dismissal of Plaintiff's Complaint." ECF No. 50. On June 22, 2018, Plaintiff filed a Response in Opposition to the [Federal] Defendant[]s['] Motion to Dismiss.  ECF No. 51.  That same day, Defendant Salkini filed a Response in Opposition to Plaintiff's Motion for Leave to File Motion to Strike and Motion to Strike Plaintiff's Surreply. ECF No. 52.  By Order entered June 25, 2018, Plaintiff's Request for Leave to Reply to Defendant Salkini's Second

Attempt at Dismissal of Plaintiff's Complaint was construed as a Motion to File Surreply and denied. ECF No. 53.

On July 9, 2018, Plaintiff filed a "Motion for Reconsideration of the Court's June 19, and June 25, 2018 Orders" and an "Expert Witness Affidavit in Support of Complaint." ECF Nos. 55, 56.

This matter is now pending before the undersigned for an initial review and Report and Recommendation pursuant to LR PL P 2 and 28 U.S.C. § 1915.

## II. The Pleadings

### A. The Complaint

In the complaint, filed without a memorandum in support, and in very brief and general terms, without providing any detail as to the facts, Plaintiff raises claims of denial of adequate medical care; systemic  racism and racial bias in mental health care; medical malpractice; discrimination and retaliation;  and violation of his rights to free speech and to be free from cruel and unusual  punishment.   ECF No. 1 at 7 – 9. Plaintiff's complaint indicates that the acts complained of occurred at FCI Morgantown in Morgantown, West Virginia.  Id. at 4.

Plaintiff maintains that he has exhausted his administrative remedies with regard to his claims.  Id. at 4 – 5. He contends that as a result of Defendants' actions, he is now impotent, maimed, and suffers from depression. Id. at 9.

As relief, he seeks a hearing, a jury trial, and unspecified damages "sought in the complaint."  Id.

### B. Defendant Salkini's Motion to Dismiss, ECF No. 12

Defendant Salkini argues that the complaint should be dismissed pursuant to Fed.R.Civ. P. 12(b)(6), because

1)   Plaintiff failed to comply with mandatory pre-suit filing requirements as set forth in the West Virginia Medical Professional Liability Act ("WVMPLA");

2)   the complaint does not allege facts sufficient to support a cause of action for medical malpractice; despite having referred to an attached memorandum, none was attached; and

3)   the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(2), 12(b)(4), and 12(b)(5), because Plaintiff failed to timely serve Dr. Salkini within ninety days of the filing of his complaint.

ECF No. 12 at 1.

## C. **Plaintiff's Response in Opposition to Defendant Salkini's Motion to Dismiss, ECF No. 31**

Plaintiff's response in opposition, for the first time, provides specific detail regarding Defendant Salkini's alleged racism toward Plaintiff, and the malpractice Salkini allegedly committed before, during, and after a bladder stone removal procedure he performed on Plaintiff on or about June 27, 2016. ECF No. 31 at 2 – 3.

Specifically, Plaintiff contends that prior to his surgery, Salkini delayed treatment for his "serious medical condition" by "initiat[ing] a year-long billing process while the Plaintiff suffered abdominal and leg pain, [and had] frequent[] . . . blood in his urine." Id. at 2 – 3. He contends that Salkini and his staff harbored racist feeling against him, and the male staff appeared to "take issue" with the size of his genitalia. Id. at 3.

He avers that after being told preoperatively that he would have a "pin size incision in his side," Salkini left him with a 6 or 7-inch incision. Id. at 3; see also ECF No. 31-4 at 3. Plaintiff contends that his surgery was not performed in a "standard operating room like other non-black patients," but in a "back corner dirty room." ECF No. 31 at 3. He alleges that after he woke up in recovery, he vomited and later that evening, his blood pressure "surge[d] dangerously high," [id.] but that despite these "post-surgery complications," he was discharged without any further treatment or instruction on how to take care of his incision or the Foley catheter that was

5

"surgically inserted into him." Id. He was told he would be seen in follow up in two weeks, but before that, he developed an infection, so the catheter was removed by non-hospital personnel.  Id. At his two-week follow-up visit with Salkini, "despite being informed of Plaintiff's post-surgery complications and illness, a nonskilled hospital employee following Salkini's instruction . . . attempted to re-insert the catheter without the use of anesthesia." Id. When Plaintiff became upset, "Salkini and the hospital employees recognize[d] their mistake . . . called the procedure off" and discharged him with no post-surgery x-ray or examination of his wounds.  Id.

Plaintiff further alleges that "during the surgery Salkini deliberately or accidentally severed several nerves resulting in impotence, back and lower leg pain" for Plaintiff.  Id. at 4. He implies that this was done because of racial animus toward him. Id. These complications caused him to develop "suicidal depression," resulting in his being declared disabled by the Social Security Administration. Id. at 5. In an attached affidavit, he also contends that his wife, who is twenty years younger than he, "left me due [to] my post-surgery state of mind [and] inability to perform sexually." ECF No. 31-4 at 4.

Plaintiff asserts that "all defendants named in the complaint either work for the . . . [DOJ] and or BOP or are paid by them for their services." Id. at 6. Therefore, he concludes, because RMH and its employees, like Dr. Salkini, have enjoyed a 30-year long multi-million-dollar business relationship with the BOP, Salkini and RMH are agents of the BOP.  Id. at 6.

Finally, for the first time, he alleges that Salkini demonstrated "clear deliberate indifference to his rights to free of racial bias healthcare [sic], medical malpractice and discrimination." Id.

Plaintiff attaches a sworn affidavit from "Expert Witness Nicole Farmer, LPN [ECF No. 31-1];" a copy of an April 10, 2018 FOIA request from him to the RMH Medical Records department, seeking "copies of all public records that show and describe[] the outcome of kidney

stone [sic] removal proceedings perform[ed]by Dr[.] Mohamad Salkini on a racial base . . . [copies of] all disciplinary action taken against Dr. Salkini over the last ten years and any [and] all racial complaints filed against same doctor and RMH over the same period (last ten-year)" [ECF No. 31-2 at 2]; and his own sworn affidavit, alleging additional factual detail. ECF No. 31-4.  He also produced a thumb drive containing copies of some of his RMH medical records. ECF No. 31-3.

## D. <u>Defendant Salkini's Reply, ECF No. 36</u>

Defendant Salkini reiterates his argument that the complaint should be dismissed for failure to state a claim upon which relief can be granted. He asserts that the Court may not consider any information Plaintiff provides that was not included in Plaintiff's complaint, and that Plaintiff's affidavit, attached to his response, must be disregarded, because such consideration of the same would convert Plaintiff's response into a Motion for Summary Judgment.  ECF No. 36 at 1 - 2.

Further, Salkini notes that Plaintiff's response still fails to address his failure to comply with the mandatory pre-suit filing requirements of the WVMPLA; fails to allege sufficient facts to state a medical malpractice claim; and does not even allege that Dr. Salkini was acting under the color of federal law when he treated Plaintiff. <u>Id.</u> at 1 – 6.

Dr. Salkini argues that Plaintiff's many other claims, including his new claim of "bad faith" against Dr. Salkini[3] and "the undersigned"[4] for failing to respond to his FOIA request, raised for the first time in his response in opposition to Salkini's dispositive motion, should likewise be disregarded. <u>Id.</u> at 2. Finally, Salkini reiterates his argument that the complaint should be dismissed for failure to timely effectuate service.  <u>Id.</u> at 7.

---

[3] This claim of bad faith was actually made against RMH, but inexplicably, Plaintiff attached the FOIA request referenced within it to his response in opposition to Salkini's dispositive motion.

[4] It is unclear who "the undersigned" references; Dr. Salkini's reply seems to imply that it is a reply filed not only on his behalf, but also on behalf of someone else.  <u>See</u> ECF No. 36, n.1 at 2.

**E. Defendant RMH's Motion to Dismiss, ECF No. 23**

Defendant RMH argues that the complaint should be dismissed pursuant to Fed.R.Civ.P.

12(b)(6) because

1)   Plaintiff fails to state a <u>Bivens</u> claim upon which relief can be granted against RMH;

2)   Plaintiff failed to comply with the mandatory pre-suit notice of the WVMPLA requirements before initiating suit against RMH; and

3)   Plaintiff's claims may be barred by the applicable statute of limitations because it is unclear from the complaint when the medical care at issue occurred.

4)   Plaintiff's complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(2), 12(b)(4), and 12(b)(5) for insufficient service of process.

ECF No. 23 at 1; ECF No. 23-1 at 1 – 2, 7.

**F. Plaintiff's Response in Opposition to Defendant RMH's Motion to Dismiss, ECF No. 35**

Plaintiff contends that RMH's dispositive motion should be denied because it is "based on bad faith and [is] untrue." ECF No. 35 at 2. He notes that RMH denied that Dr. Salkini has any affiliation with them and therefore they "are not responsible for his incompetence. However, on its own web page Dr. Salkini is listed as an Associate Professor for the hospital." <u>Id.</u> Further, he asserts that in its motion to dismiss, RMH denied having received a copy of the complaint, "but in a letter addressed to Plaintiff . . . [declining his offer to settle, RMH] conceded that it . . . was in possession of the complaint." <u>Id.</u>

Plaintiff then attempts to refute RMH's arguments, contending that RMH is in fact subject to a <u>Bivens</u> action, because <u>Bivens</u> actions may be brought against private entities operating under color of federal law, in the same manner that § 1983 actions may be brought "against persons acting under color of state law." <u>Id.</u> at 3.  He contends that that despite claiming to be a private corporation, RMH "has little to no problem receiving[]g and correcting [sic] tens of millions [of] dollars from the federal government" including among other things, for providing medical services

8

to state and federal prisoners. Id. He cites to United States v. Day[5] for the proposition that RMH and its employees qualify as agents of the federal government, providing medical service under the color of law. Id.

Plaintiff states that Dr. Salkini's bladder stone removal procedure "was an act of medical malpractice in its purest form" and that RMH's failure to follow its own post-surgery follow up procedure was malpractice on its part.  Id. He argues that before surgery, he was told he would have a "pin size incision" but woke to find a 6-inch incision.[6] Id. at 4.  Further, his surgery was performed in a "back corner dirty room" rather than the "standard operating room" used for "other non-black patients." Id. He further avers that he became ill in the recovery room and vomited; later, the first night after surgery, his blood pressure "surge[d] dangerously high." Id.

Plaintiff contends that despite these "post-surgery complications" Salkini discharged him without any further treatment or post-operative instructions on how to care for his wounds. Id.

Plaintiff avers that in the over the eighteen months Salkini treated him, Salkini charged the government over $200,000.00 for spending less than 30 minutes with him. Id. He concludes that "[n]o non-black patient has or would have received such inadequate medical service.  This was medical malpractice." Id. He reiterates his claim that he was to be seen two weeks after discharge, but because he developed an infection before that, the catheter was removed by "non-hospital personnel." Id. A "non-skilled hospital employee following Salkini's instruction" attempted to reinsert the catheter without using anesthesia, but when Plaintiff became upset, "Salkini and the hospital employees recognize[d] their mistake and called the procedure off." Id. at 5.  He avers that he was discharged without an x-ray or examination of his wound, and "[t]o this day, no one

---

[5] United States v. Day, 591 F.3d 679 (4th Cir. 2010).

[6] In his attached affidavit, Plaintiff states it was a 7-inch incision. ECF No. 31-4, ¶9 at 3.

from . . . [RMH] has attempted to follow up with" him about "the neglect he received" and he still does not know whether all the stones were removed; what caused them; whether any nerves were accidentally or deliberately severed during the procedure; and whether black patients are treated differently than non-black ones. Id.

Plaintiff's response includes an excerpt which appears to have been copied/pasted from an unidentified source, titled "MEDICAL TEXBOOK . . . [STANDARD]" regarding the complications of bladder stone surgery, which includes the statement "[y]ou will probably be asked to attend a follow-up appointment where X-rays or a CT scan can be used to check that all the fragments of the bladder stones have been removed from your bladder" and a statement to the effect that "[o]nce the bladder stones have been removed it is necessary to treat the underlying cause to avoid new bladder stones from forming." Id. He concludes that any "adequate" postoperative "follow up treatment plan" should have included an "ultrasound abdominal examination and or x-ray of the surgical area." Id. at 6. Further, he avers that generally, "all patients are given a discharge instruction on caring for their wounds and a[n] emergency contact list." Id. He states that "[e]ither of these options were presented to the Plaintiff."[7] Id.

Plaintiff alleges that "[a]ccording to Dr. Zia Abdi of Atlanta Georgia" who examined him, not only were proper pre-op and post op procedures not followed at RMH, "but during the surgery Salkini deliberately or accidentally severed several nerves resulting in impotence, back and lower leg pain[.]" Id.

Next, Plaintiff raises a new claim, arguing that that RMH committed "bad faith" by failing to abide by FOIA's mandatory release requirements when it failed to respond to his request for "previously undisclosed documentation of systemic racism and racial bias, medical malpractice,

---

[7] The undersigned presumes that Plaintiff intended to say that "neither of these options" were presented to him.

10

and discrimination" that he sought before RMH filed its response, so that he would "be in a best position to properly reply[.]" Id. Instead, he contends, RMH moved for dismissal of the complaint, which was "nothing more than a ploy to prevent the release of damning documentation." Id.

He again attempts to refute RMH's claim that Dr. Salkini was not an agent, servant, or employee, by noting that on RMH's web page, Salkini is listed as an Associate Professor of RMH; he also includes what appears to be an excerpt from his operative record, which was signed by a resident of "West Virginia University Division of Urology" and is co-signed by Salkini.  Id. at 6 – 7.

Plaintiff argues that RMH's claim that the complaint should be dismissed for its failure to comply with the mandatory pre-suit requirements of the WVMPLA is a "ridiculous assertion" and that RMH is "attempting to use a state law to take issue with the Court's administration handling of this matter;" noting that "this is a federal not state matter[.]" Id. at 8.

In response to RMH's argument that if the medical care at issue occurred more than two years before the complaint was filed, Plaintiff's claims might be barred by the applicable statute of limitations, Plaintiff contends that the complaint was filed on August 17, 2017, and his claims allege racial bias and medical malpractice that occurred between September 28, 2015 through July 15, 2016, within the two-year statute of limitations. Id.

## G. Federal Defendants' Motion to Dismiss, ECF No. 43

In their dispositive motion, the Federal Defendants assert that the case should be dismissed because:

1)  the complaint fails to state a claim upon which relief can be granted [ECF No. 43-1 at 4]; and

2) the complaint fails to sufficiently allege personal involvement by any individual federal defendant. Id. at 6.

The Federal Defendants attach the sworn declaration of Howard Williams, Legal Assistant at the BOP Mid-Atlantic Regional Office [ECF 43-2]; a copy of Plaintiff's Public Information Inmate Data [ECF No. 43-3 at 2 - 5]; and a copy of Plaintiff's Inmate History. ECF No. 43-3 at 7 - 9.

## H. **Plaintiff's Response in Opposition to Federal Defendants' Motion to Dismiss, ECF No. 51**

Plaintiff's response contends that the Federal Defendants' motion to dismiss is "nothing more than a stall tactic to move the Court's intention [sic] off Plaintiff's June 4, 2018, Motion for Default Judgment," which he filed when the Federal Defendants did not timely file their response. ECF No. 51 at 1.  He avers that the Federal Defendants overlook all the evidence submitted thus far, but notes that they have not argued that Plaintiff's claims "are false or incorrect." Id. at 2.

## III. **Standard of Review**

### A. **Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1356 (1990). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts have long cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitled him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not asserts "detailed factual allegation," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Twombly</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>id.</u> (citations omitted), to one that is "plausible on its face," <u>id.</u> at 570, rather than merely "conceivable," <u>Id.</u> Therefore, in order for a complaint to survive a dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir. 2003) (citing <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir. 2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim had facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. <u>Id.</u>

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**B. <u>Summary Judgment</u>**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 447 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.

The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence

14

must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587 (citation omitted).

## IV. Analysis

### A. Deliberate Indifference to Serious Medical Needs

In general, the Eighth Amendment prohibits "cruel and unusual punishment." Farmer v. Brennan, 511 U.S. 825 (1994). In order to comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at 837.

To demonstrate that a prison official violated the Eighth Amendment by denying medical care, an inmate must show (1) that the deprivation alleged was objectively "sufficiently serious" and (2) that the prison official was "deliberately indifferent" to the inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994). With respect to the first element, a medical condition is sufficiently serious if it is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014); see also Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent

15

loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).[8]

As to the second element, a prison official cannot be found to be deliberately indifferent to an inmate's health or safety unless the official knows of and disregards an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837. This standard is a higher standard for culpability than mere negligence or even civil recklessness, and because of this, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference. Jackson, 775 F.3d at 178. If a prison official does have knowledge of a substantial risk to inmate health or safety, he or she may still be free from liability if they responded reasonably to the risk, even if

---

[8] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W.Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip condition that caused a prisoner "great pain over an extended period of time and . . . difficulty walking" is a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2nd Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. See, e.g., Lepper v. Nguyen, 368 F. App'x. 35, 39 (11th Cir. 2010); Andrews v. Hanks, 50 Fed. Appx. 766, 769 (7th Cir. 2002); Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998) Beaman v. Unger, 838 F.Supp. 2d 108, 110 (W.D. N.Y. 2011); Thompson v. Shutt, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); Mantigal v. Cate, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) *report and recommendation adopted,* 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); Johnson v. Adams, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); Bragg v. Tyler, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); Vining v. Department of Correction, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. Cokely v. Townley, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

the harm ultimately was not averted.  Farmer, 511 U.S. at 844.  On the other hand, a doctor's failure to provide care that he himself deems necessary to treat   an   inmate's serious medical   condition may constitute  deliberate indifference.  Jackson, 775 F.3d at 179 (citing Miltier v. Boern, 896 F.2d 848, 853 (4th Cir. 1990) (overruled on other grounds)).

**1)  The DOJ is Not a Proper Bivens Defendant**

This action is being analyzed pursuant to Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). However, a Bivens cause of action cannot be brought against a federal agency. See FDIC v. Meyer, 510 U.S. 471, 486 (1994); Steele v. Federal Bureau of Prisons, 355 F. 3d 1204 (10th Cir. 2003). Accordingly, because the DOJ is not a proper defendant, the complaint must be dismissed against it.

**2) Federal Defendants**

Plaintiff's complaint does not actually assert a claim of deliberate indifference to serious medical needs in violation of the Eighth Amendment against any of the named defendants, let alone the Federal Defendants.  It merely states "denied adequate medical care."

Plaintiff's complaint does not comply with the Federal Rules of Civil Procedure requirement that only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . .  claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555. Although Plaintiff's complaint is certainly short and plain, it is so terse it fails to provide any factual allegations against any of the Federal Defendants. While it does make brief conclusory allegations that Plaintiff was denied adequate medical care, nowhere does it describe what happened, when it happened, how it happened, or allege that any of the Federal Defendants, let alone any other named defendant, participated in such actions or violations.

When deciding a Rule 12(b)(6) motion to dismiss, the district court is limited to the allegations set forth in the complaint. See Kennedy v. Chase Manhattan Bank, 369 F.3d 833, 839 (5th Cir. 2004); cf. Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984) (explaining that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"); see also Agnew v. NCAA, 683 F.3d 328, 348 (7th Cir. 2012) (It is improper to amend a complaint via a response to a motion to dismiss). However, here, because the Plaintiff is an unskilled *pro se* litigant, the undersigned will construe his  response in opposition to Dr. Salkini's motion to dismiss, with its affidavits, medical records, and other attached documents, as not only his response in opposition, but also a memorandum in support of his complaint.  Even in doing so, there is still no allegation against any individual Federal Defendant for violating Plaintiff's constitutional rights with regard to his medical care.  See ECF No. 31.

The Federal Defendants have filed a Motion to Dismiss, to which they attached the sworn declaration of Howard Williams, Legal Assistant at the BOP Mid-Atlantic Regional Office; a copy of Plaintiff's Public Information Inmate Data; and a copy of Plaintiff's Inmate History [ECF Nos. 43-2, 43-3 at 2 – 5; and 43-3 at 7-9]; accordingly, their dispositive motion is construed as a Motion for Summary Judgment. In their motion, the Federal Defendants argue that Plaintiff's claims are so insufficiently pled that they are "naked assertion[s] devoid of further factual enhancement" which fall woefully short of Fed.R.Civ.P. 8's pleading requirements.   Further, they argue, Plaintiff fails to allege any personal involvement by any of them.

The undersigned agrees.  Even in his terse June 22, 2018 response in opposition to the Federal Defendants' dispositive motion, Plaintiff still fails to identify which Federal Defendant committed which alleged acts, when any specific act was committed, or to provide factual detail regarding any of his claims.

Even if the affidavit Plaintiff attached to his June 4, 2018 Motion for Default Judgment could be construed as an additional memorandum in support of his complaint, the claims against these defendants would still be due to be dismissed.  While that affidavit finally does allege that "the failure to provide adequate medical treatment" to him "was just one example of deliberate indifference [ECF No. 39-4 at 2]," in it, Plaintiff still fails to identify which BOP medical provider(s) denied him care. The only BOP Health Services staff it names is Defendant Crogan, a retired Assistant Health Services Administrator. However, Plaintiff made no allegation against her in his complaint, the construed memorandum in support, or in his response in opposition to the Federal Defendants' dispositive motion, and the only allegation he made against her in the affidavit attached to the Motion for Default Judgment was that on an unspecified date, she summoned him to her office and made him "sit in pain for an hour while she demeaned me in hope of provoking me so that the lieutenant locks me up again for nothing;" nowhere does he allege she was deliberately indifferent to a serious medical need, or that she ever personally denied him care. ECF No. 39-4 at 3.

Beyond that, and conclusory allegations made generally toward "all of the named defendants" regarding systemic racism and bias, discrimination and retaliation in the affidavit attached to the Motion for Default, Plaintiff's only other specific allegation against any of the Federal Defendants is that some of them denied his grievances. Id., ¶¶ 4, 7, 9 at 3 – 4. However, to the extent that the Plaintiff may be asserting that any of the Federal Defendants were deliberately indifferent to his serious medical needs by denying his administrative grievances, that claim is also without merit because that is not the type of personal involvement required to state a Bivens claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

Liability in a <u>Bivens</u> case is "personal, based upon each defendant's own constitutional violations." <u>Trulock v. Freeh</u>, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). Therefore, in order to establish liability in a <u>Bivens</u> case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2nd Cir. 1994); <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown.  <u>See</u> <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986).

It is true that Plaintiff is a *pro se* litigant whose pleadings are to be liberally construed and held to a less stringent standard. <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991). However, "[t]his rule requires the Court to look beyond a failure to cite proper legal authority, confusion of legal theories, and poor syntax or sentence construction. <u>Id.</u> The Court is not authorized to become the advocate for the *pro se* litigant. <u>Id.</u> The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts that set forth a claim cognizable in a federal district court.  <u>Weller v. Dept. of Social Services</u>, 901 F.2d 387 (4th Cir. 1990). Although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. <u>Randall v. United States</u>, 95 F.3d 339 (4th Cir. 1996). <u>See</u> <u>also</u> <u>Dunbar Corp. v. Lindsey</u>, 905 F.2d 754, 764 (4th Cir. 1990). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. <u>See</u> <u>Forsyth v. Barr</u>, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).  "Unsupported speculation is not sufficient to defeat a summary judgment motion." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d at 1128.

20

Accordingly, Plaintiff's implied claim of deliberate indifference to serious medical needs against the Federal Defendants, framed here as a "denial of adequate medical care," fails to state a claim upon which relief can be granted. Plaintiff has not demonstrated the existence of a genuine issue of material fact with regard to this claim, and summary judgment on this issue should be granted for Federal Defendants.

### 3) Dr. Salkini

To the extent that Plaintiff intended to allege that Salkini was deliberately indifferent to his serious medical needs, Plaintiff's terse complaint, alleging "denied adequate medical care" likewise fails to state a Bivens claim. Plaintiff's lengthy response in opposition to Salkini's 12(b)(6) motion finally provides factual detail, along with affidavits, medical records, and other documents, information that was previously entirely absent from his complaint, to explain his claims. Plaintiff also argues that Salkini, as an employee of RMH, are agents of the BOP because they have had a 30-year long "multi-million-dollar relationship" together, providing medical care to federal prisoners.

As previously noted, a court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. See Spivey v. Robertson, 197 F.3d 772, 774 (5th Cir. 1999). Pleading deficiencies in a complaint cannot be cured with later-filed supporting documentation. See E.I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 448-49 (4th Cir. 2011) (explaining that "matters beyond the pleadings . . . cannot be considered on a Rule 12(b)(6) motion"); Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007). Nonetheless, as noted *supra*, given that *pro se* Plaintiff is an unskilled *pro se* litigant, the undersigned will also construe Plaintiff's response in opposition to Salkini's dispositive motion, with its affidavits and attachments as the memorandum in support that he failed to attach to his complaint when he filed it. However, even

affording Plaintiff this very liberal construction of his pleadings, his claims against Salkini are still due to be dismissed. Even liberally construed and assumed as true, Plaintiff's allegations are insufficient to establish that Dr. Salkini acted under color of federal authority for the purpose of stating a claim for relief under Bivens. See Romero v. Peterson, 930 F.2d 1502, 1506 (10th Cir. 1991) ("To state a Bivens action, plaintiff must allege circumstances sufficient to characterize defendants as federal actors."). Absent such a showing, Dr. Salkini must be dismissed from this action.

Plaintiff's "denied adequate medical care" allegation against Dr. Salkini is assessed under Bivens, in which the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." Correctional Services Corp. v. Malesko, 534 U.S. 61, 66 (2001). Bivens created a cause of action against individual federal actors. While the Supreme Court has found a private physician employed by a prison acts under color of state law for purposes of stating a claim for relief under 42 U.S.C. § 1983, West v. Atkins, 487 U.S. 42 (1988), it has not extended the Bivens remedy to allow recovery against comparable private individuals acting under federal authority or contract. See Correctional Services Corp. v. Malesko, 534 U.S. 61 (2001)(no implied private right of action, pursuant to Bivens, for damages against private entities engaged in alleged constitutional violations while acting under color of federal law); Minneci v. Pollard, 565 U.S. 118, 132 S.Ct. 617 (2012)(prison staff at private prisons contracting with federal government cannot be sued for constitutional violations where state tort law provides a remedy).

Here, Salkini, a urologist who is affiliated with and performs surgeries at RMH, is a private actor. Neither Dr. Salkini nor RMH, the hospital where Salkini performed Plaintiff's surgeries, are owned or operated by the BOP. Dr. Salkini, without any prior approval from the BOP, formed an

independent diagnosis of Plaintiff's condition and performed surgery to correct the same. Despite Plaintiff's attempts to characterize Salkini as an agent, servant, or employee of RMH, Dr. Salkini denies being an employee of RMH [ECF No. 36 at 6] and RMH likewise denies the same [ECF No. 231 at 7]. However, even if Salkini *were* an employee of RMH, that would still not render him a federal actor, because RMH, as a part of the West Virginia United Health System, Inc., a privately-owned corporation, is an *entity*, not an individual.  As noted *supra*, <u>Bivens</u> causes of action are only available against federal officers in their individual capacities; they are not available against the federal agencies which employ them as persons acting under federal law.  <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 484-86 (1994) (refusing to find a <u>Bivens</u> remedy against a federal agency); <u>see</u> <u>also</u> <u>Randall v. United States</u>, 95 F.3d 339, 345 (4th Cir. 1996) ("Any remedy under <u>Bivens</u> is against federal officials individually, not the federal government.").

Even if private individuals engage in federal action that violates constitutional rights, their acts do not give rise to <u>Bivens</u> actions when alternative remedial schemes exist that can protect plaintiffs' interests.  In <u>Holly v. Scott</u>,[9] the Fourth Circuit concluded that injured federal prisoners can file state-law damages suits for maltreatment under the watch of privately employed federal prison guards. <u>Holly</u>, 434 F.3d at 295 - 97.  The Fourth Circuit explained that by contrast, the Supreme Court recognizes <u>Bivens</u> actions only when plaintiffs otherwise would have no alternative remedy, or at least none against individual federal employees. <u>Holly</u>, 434 F.3d at 295. Here, Plaintiff has an alternative remedy, a medical malpractice action against Salkini under West Virginia state law.  The Fourth Circuit has also concluded that physicians contracted to treat inmates cannot be <u>Bivens</u> defendants. See <u>O'Neil v. Anderson</u>, 372 Fed. Appx. 400, 401, 2010 U.S. App. LEXIS 6428, *1 (4th Cir. Mar. 29, 2010) (*per curiam*) (declining to

---

[9] <u>Holly v. Scott</u>, 434 F.3d 287 (4th Cir. 2006).

extend a Bivens remedy against a doctor who was an independent contractor because of the availability of a state court remedy for medical negligence).

Therefore, at best, Plaintiff's allegations regarding Salkini's medical and surgical treatment reflect claims of medical negligence, rather than any deliberate indifference, and are insufficient to establish a cognizable constitutional claim for relief under Bivens.

## 4) **Defendant RMH**

To the extent that Plaintiff intended to raise a claim of deliberate indifference to serious medical needs against RMH, as previously noted, Plaintiff's complaint alleges generally that he was denied medical care, but fails to identify who committed it, or when or how it happened.  His response in opposition to Dr. Salkini's dispositive motion, construed here as a memorandum in support, provides more detail to his claims. Nevertheless, Plaintiff's implied deliberate indifference claim against RMH is due to be dismissed.

Defendant RMH contends, *inter alia*, that as a private hospital, it is not a proper defendant for a Bivens action.  ECF No. 23-1 at 3. RMH attaches a Fed.R.Civ.P. 7.1 Disclosure Statement, identifying itself as a "non-governmental corporate party" whose parent corporation, as noted *supra*, is the West Virginia United Health System, Inc. See ECF No. 24 at 1.

In his response in opposition to RMH's dispositive motion, Plaintiff provides extensive allegations, albeit primarily against Dr. Salkini, detailing multiple ways in which Salkini and RMH allegedly mistreated him or committed "medical malpractice." ECF No. 35 at 3 – 7. He attempts to portray Salkini as an agent or employee of RMH, because Salkini is listed on RMH's web page as an Associate Professor. ECF No. 35 at 2. He argues that RMH, and Salkini as its employee, are federal actors because they "receive tens of millions dollar[s]" from the federal government via grants, scholarships, and payments for services rendered, including providing medical care to

federal prisoners, which qualifies them as agents of the federal government providing medical service under the color of law. Id. at 2 – 3. Plaintiff cites to Nwanze v. Phillip Morris, Inc., 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000) for the proposition that courts treat Bivens actions and § 1983 actions "as analogous for most purposes." Id. at 3. He then cites to United States v. Day, 591 F.3d 679 (4th Cir. 2010). Further, he argues that the test for whether a party is a federal actor is similar to the tests employed to determine whether a private party acts under color of state law; he provides citations to several cases addressing the issue of whether a private party is a state actor.

Plaintiff's reliance on Day and the other cases he cites is inapposite, because the cases address the issue of whether private parties can be *state* actors, not federal actors, subject to Bivens liability.  Further, Plaintiff's reliance on Nwanze is misplaced. As an initial note, Nwanze is not binding precedent in this jurisdiction. While Nwanze does note that courts treat Bivens actions and § 1983 actions as analogous for most purposes, frequently treating rules of decision in one context as binding in the other [Nwanze, 100 F. Supp. at 220], it also makes it clear that "[a]s a general rule, only governmental actors may be held responsible for constitutional violations. See id., *quoting* Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156, 56 L.Ed. 2d 185, 98 S. Ct. 1729 (1978). Nwanze further notes that while private entities that act in concert with *state* actors may be sued under § 1983, whether the same would apply when federal officials are involved would give rise to a Bivens action is the subject of a significant controversy among federal courts; notably, it did not attempt to address the issue. Nwanze at 221 (all internal citations removed). The undersigned also notes that Plaintiff appears to overlook the fact that Nwanze also holds that a Bivens cause of action cannot be brought against a federal agency. See Nwanze, 100 F. Supp. at 220, *quoting* FDIC v. Meyer, 510 U.S. at 486.  Accordingly, because  RMH is not a proper defendant, Plaintiff's claim of deliberate indifference against it must be dismissed.

**B. <u>Systemic Racism and Racial Bias in Mental Health Care</u>**

The Plaintiff's complaint alleges that "systemic racism . . . and racial bias in mental health care" occurred at FCI Morgantown. He does not describe what acts were committed, when they were committed, or who committed them.  Plaintiff has produced no records of mental health treatment, nor has he alleged that he ever sought or received any such treatment.

**1) <u>Federal Defendants</u>**

Plaintiff makes no claim, either in his complaint or his response in opposition to the Federal Defendants' dispositive motion, construed here as a summary judgment motion, to elaborate on this claim, describe what "mental health care" he is referring to, or identify which one of the Federal Defendants committed the allegedly racially biased acts.

As noted previously, liability in <u>Bivens</u> is "personal, based upon each defendant's own constitutional violations." <u>Trulock v. Freeh</u>, 275 F.3d at 402, and to establish liability in a <u>Bivens</u> case, a plaintiff must specify the acts taken by each defendant which violate his constitutional rights. <u>See</u> <u>Wright v. Smith</u>, 21 F.3d at  501. Plaintiff has not met this standard. Accordingly, because Plaintiff has failed to state claim upon which relief can be granted, and because there is no genuine issue of material fact regarding this claim, it should be dismissed as to the Federal Defendants.

**2) <u>Dr. Salkini</u>**

To the extent that Plaintiff intended to raise this <u>Bivens</u> claim against Salkini, Plaintiff's complaint likewise makes no allegation that Salkini was racially biased toward him with regard to "mental health care," only that there was "systemic racism treatment and racial bias in mental health care."  ECF No. 1 at 8.  Because Salkini is a urologist, the undersigned is hard-pressed to imagine what mental health care Plaintiff alleges Salkini was racially biased in delivering.

Salkini's response in opposition asserts that Plaintiff's complaint is "fatally unclear," in that it fails to link Plaintiff's claims of systemic racism to any act on Dr. Salkini's part in providing urology treatment. ECF No. 12-1 at 9.  Salkini further asserts that the complaint does not even describe any treatment Plaintiff received from Salkini or draw any link from Salkini's treatment and Plaintiff's injuries. Accordingly, Salkini contends Plaintiff has failed to state a claim upon which relief can be granted. Id. at 9 – 10.

The undersigned agrees.  While Plaintiff's allegations are to be taken as true and viewed in the light most favorable to him, even construing his response in opposition to Salkini's dispositive motion as a memorandum in support, this claim falls far short of what is required to prove Bivens liability. Plaintiff's complaint fails to specify any acts personally taken by Salkini which allegedly violated his constitutional right to receive mental health care free of racial bias. Wright v. Smith, 21 F.3d at 501. Accordingly, the undersigned recommends that this claim against Salkini be dismissed.

## 3) RMH

To the extent that Plaintiff intended to raise this Bivens claim against RMH, Plaintiff's complaint likewise makes no allegation that RMH provided racially biased "mental health care," only that there "systemic racism treatment and racial bias in mental health care" occurred, without specifying who committed it.  ECF No. 1 at 8.  Because Plaintiff's RMH records do not even reflect that Plaintiff ever went to RMH to receive any "mental health care," only treatment for urological problems, it is unclear what mental health care Plaintiff alleges RMH was racially biased in delivering.

RMH's motion to dismiss asserts that Plaintiff's complaint should be dismissed because RMH is not a federal actor, subject to <u>Bivens</u> claim liability. ECF No. 23-1 at 3. The undersigned agrees and recommends that this claim against Salkini be dismissed.

## C. <u>Discrimination and Retaliation</u>

Again, as with the rest of his claims, Plaintiff's complaint merely alleges that discrimination and retaliation occurred, but does not identify which defendants committed the acts, what the acts were, when they occurred, or provide any factual detail as to who committed them.

### 1) <u>Federal Defendants</u>

Beyond listing their names in the complaint, Plaintiff never mentions the Federal Defendants again and clearly fails to state what action they took that violated his constitutional rights. Even when considering his construed memorandum in support, Plaintiff fails to identify any Federal Defendant who was personally involved in the violation of his rights with regard to this claim. Accordingly, the Plaintiff has failed to state a claim for relief against the Federal Defendants, and because there is no genuine issue of material fact, they should be dismissed as defendants.

### 2) 3) <u>Dr. Salkini and RMH</u>

To the extent that Plaintiff intended to raise this <u>Bivens</u> claim against these two defendants, beyond listing their names in the complaint, Plaintiff never mentions Dr. Salkini or RMH again and fails to state what action they took that violated his constitutional rights. Even in his construed memorandum in support, Plaintiff's bald assertion that "discrimination and retaliation" occurred is merely a conclusory allegation, insufficient to establish a constitutional claim, and provides no evidence to support even a *prima facie* case of discrimination or

retaliation. Moreover, because neither Salkini or RMH are federal actors, neither are subject to <u>Bivens</u> liability and this claim should be dismissed.

## D. <u>Violation of Plaintiff's Right to Free Speech and to be Free of Cruel and Unusual Punishment</u>

Plaintiff's complaint makes a terse allegation that his right of freedom of speech and his right to be free from cruel and unusual punishment were violated.  ECF No. 1 at 9. He provides no detail as to how, when, or where this happened, what speech of his was infringed upon, or which of any of the named defendants were involved in these alleged violations; he merely states "see Memorandum in support," without including one. Even when construing Plaintiff's response in opposition to Salkini's dispositive motion as a memorandum in support, it sheds no light on this claim.

### 1) <u>Federal Defendants</u>

The Federal Defendants aver that Plaintiff has failed to allege personal involvement by any one of them; Plaintiff's response in opposition to their dispositive motion is silent on the issue. Again, <u>Bivens</u> liability is personal, based specifically and exclusively upon an individual's own conduct. <u>Trulock v. Freeh</u>, 275 F.3d at 402. Accordingly, because Plaintiff has failed to state a claim upon which relief can be granted, and there is no genuine issue of material fact regarding this claim, it should be dismissed as to the Federal Defendants.

### 2) 3) <u>Dr. Salkini and RMH</u>

To the extent that Plaintiff intended to raise this <u>Bivens</u> claim against these two defendants, the undersigned cannot determine from Plaintiff's terse pleadings whether he is alleging that Dr. Salkini and RMH were participants in the violation of his right to freedom of speech and to be free from cruel and unusual punishment, because Plaintiff's pleadings, including his construed memorandum in support, are so lacking in factual detail.

Nonetheless, because neither Dr. Salkini and RMH are federal actors, subject to <u>Bivens</u> liability, this claim against them should be dismissed for failure to state a claim upon which relief can be granted.

## E. <u>Medical Malpractice</u>

In his complaint, in support of this claim, Plaintiff simply states "medical malpractice." ECF No. 1 at 8. He does not identify who committed it, when it happened, or where it occurred. Nonetheless, he provides this description of his resultant injury: "[d]uring to the overall torture treatment and systemic racism, racial bias of Plaintiff's medical needs," he is now physically scarred and maimed, impotent, and depressed. ECF No. 1 at 9.

The claim in the complaint is so terse that it does not even provide enough information to explain that it arises out of the care provided by Salkini and RMH before, during, and after his June 27, 2016 bladder stone removal surgery, from September 28, 2015 through July 15, 2016. ECF No. 35 at 8.

As noted *supra*, both Salkini's and RMH's dispositive motions, not surprisingly, aver that Plaintiff's medical malpractice claim is insufficiently pled and should be dismissed for its failure to comply with the mandatory pre-suit requirements of the WVMPLA.

Contrary to what Plaintiff presumably believed when he attached his medical records, the records refute most of his claims.  There is nothing in them to support Plaintiff's conclusory allegation that Salkini deliberately delayed treating his bladder stones for a year while he billed him, just to let him suffer. The record is unclear as to when Salkini first began treating Plaintiff, although Plaintiff points to the date of September 28, 2015 as the beginning of the alleged malpractice. However, that is the date that an imaging study, ordered by a Physician's Assistant

("PA") who is not a named defendant in this action, not Salkini,[10] was performed at the hospital. Plaintiff has alleged no malpractice with regards to the September 28, 2015 imaging study, and has included no record to indicate he was seen by Salkini that day.  Nonetheless, Salkini's May 13, 2016 History and Physical ("H&P) notes that Plaintiff "has known about the [bladder] stones for about 2 years, but has been unable to have them treated." See ECF No. 31-3 at 9.  Further, Plaintiff's affidavit in support of his Motion for Default blames unspecified BOP staff for a four-year delay in his treatment for the bladder stones [ECF No. 39-4, ¶¶ 4, 6 at 3] suggesting that the reasons for the delay in treatment were outside of both Salkini's and Plaintiff's control.

Plaintiff's response to Salkini's motion to dismiss contends, in purported proof of racism and medical malpractice, that that his "medical interaction with Salkini went on for over 18 months" and Salkini charged the government "over 200,000 dollars" for spending thirty minutes total with Plaintiff, discussing his case. ECF No. 31 at 3. The limited records produced by Plaintiff, while obviously incomplete, do not support his claims.

The first visit at WVU Health System's hospital(s) included in the records Plaintiff attached is a copy of the September 28, 2015 outpatient CT[11] Intravenous Pyelogram ("IVP"), ordered by Marwan Marc Dib, PA, not Salkini, to investigate Plaintiff's symptoms of gross hematuria (blood in urine) and recurrent urinary tract infections ("UTI"). See ECF No. 31-3 at 1 – 4. It found that Plaintiff had approximately 4 bladder stones, with the largest measuring 2.2 x 1.6 cm; Plaintiff's prostate was also so enlarged that it was impinging into his bladder; and he had a tiny, 2 mm non-obstructive stone in his right kidney. Id. at 3.

---

[10] There is nothing in the record to indicate that this PA worked for Salkini or RMH.

[11] A CT scan combines a series of x-ray images taken from different angles around the body, using computer processing to create cross-sectional images (slices) of the bones, blood vessels and soft tissues inside, providing more detailed images  and information than plain x-rays do. See CT Scan, available at < https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 >

Plaintiff's affidavit, attached to his response to Salkini's dispositive motion/memorandum in support, contends that it was obvious from the beginning that Salkini and his staff "harbored racist feelings toward" him. He avers that their communications with him were "demeaning" because they would tell him some of the things they were doing "but wouldn't take input" from him at all. ECF No. 31-4 at 3.  He implies that the Salkini's male office staff harbored racial animus toward him and "took issue" with the size of his genitalia. Id.

He contends that he had "pain and discomfort" from the bladder stones for over a year, but Salkini gave him nothing for pain. Id. The records do not support this.  The September 28, 2015 outpatient radiology exam visit notes that the only symptoms Plaintiff reported were blood in his urine and frequent UTIs; there is no mention of pain. ECF No. 31-3 at 1.

Plaintiff was seen by Dr. Salkini on May 13, 2016 for his bladder stones. Id. at 9. Salkini noted that Plaintiff had had the bladder stone problem "for about 2 years, but has been unable to have them treated;" that the stones caused "recurrent UTIs and gross hematuria . . .[and that] [h]e says he always has a UTI unless he stays on an antibiotic." Id. at 9. Salkini noted that Plaintiff's symptoms of "weak stream, dribbling, hesitancy, straining, and nocturia[12] 1-2" but that "have improved since starting Flomax[13] about six weeks [ago]." Id. at 9. It is apparent from this statement that Salkini must have seen Plaintiff at the very least, at least six weeks earlier, when the Flomax was prescribed, but Plaintiff did not provide a copy of the record of that visit. Salkini conducted a detailed history and physical, noting Plaintiff's history of hypertension and stage 2 chronic kidney disease, and that his only medication was the Flomax. Id.  Salkini examined Plaintiff's September

---

[12] Nocturia is waking at night because of the need to urinate.

[13] Flomax (tamsulosin) is drug in the class of alpha blockers; it is used to treat symptoms of enlarged prostate (benign prostatic hyperplasia, or "BPH") in men. It does not shrink the prostate, but it relaxes the muscles in the prostate and bladder, helping to relieve BPH symptoms such as difficulty beginning the flow of urine, weak stream, and the need to urinate often or urgently, including during the middle of the night. See Flomax, available at < https://www.webmd.com/drugs/2/drug-4154/flomax-oral/details >

28, 2015 imaging study, noting that "[p]er our read he has 4 bladder stones with the largest being 3 cm.  Large median lobe of the prostate protruding into the bladder." Id. at 11.

Salkini then noted that "[w]he had a long discussion regarding his bladder stones" but "because of the "number of stones and their size," he recommended a cystolithotomy[14] over cystolitholapaxy,[15] noting that "[w]e discussed doing this robotic vs. open. He would like to proceed with robotic cystolithotomy. All the risks and benefits of the procedure were discussed in detail . . . with the patient, **and he signed the consent**[.]" ECF No. 31-3 at 12 (emphasis added). A robotic, or laparoscopic cystolithotomy is performed through a laparoscope and is more minimally invasive. Notably, Plaintiff did not include a copy of the informed consent that he signed, so it is unclear from the record which procedure was finally agreed upon, or whether he consented to either, the approach to be determined by the operator based on the findings at the time of surgery.

While not mentioned in Plaintiff's pleadings, the records also indicate that Salkini investigated the reason for Plaintiff's enlarged prostate before proceeding with the bladder stone removal, by doing a surgical biopsy of his prostate under local anesthesia on June 9, 2016 [id. at

---

[14] Cystolithotomy is an open surgical procedure where an incision is made in the skin just above the pubic bone, and then into the bladder, to remove bladder stones; it is generally the approach used when a patient with large or numerous bladder stones. Prior to the procedure, a Foley catheter is inserted to inflate the bladder with sterile water or saline, to make it palpable and therefore easier to outline, to prevent its accidental injury by the surgeon before it is fully exposed. Once exposed, the bladder is opened to release the water or saline; the stones are located and removed, and the bladder is then closed with absorbable suture.  The suture is tested to ensure a "water tight" closure by irrigating the bladder and observing for leaks, and then the Foley catheter is left in for 7 - 10 days to keep the bladder deflated to prevent stress on the sutures until the tissue heals. After approximately a week to ten days, a cystogram is performed to rule out any leakage from the suture line; if none, then the Foley is removed. See Cystolithotomy, *available at* < https://radiopaedia.org/articles/cystolithotomy?lang=us >

   A cystogram is an imaging test, either pictures or fluoroscopy (a kind of x-ray "movie") that can help diagnose bladder problems.  During cystography, the healthcare provider will insert a catheter to inject contrast dye into the bladder to enable the bladder to be visualized in detail before recording images. See Cystography, available at < https://www.hopkinsmedicine.org/healthlibrary/test_procedures/urology/cystography_92,p07704 >

[15] During a cystolitholapaxy, an instrument called a cystoscope is inserted into the bladder to locate the bladder stone(s), which are then crushed. See Cystolitholapaxy, *available at* < https://my.clevelandclinic.org/health/treatments/16497-cystolitholapaxy >

35 - 36]; the results of that procedure found no malignancy.  Id. at 38 – 40. The records from both visits indicate that Plaintiff was provided with careful, thorough explanations of his options and expectations for relief of his symptoms.

Salkini provided further information about the proposed cystolithotomy procedure to Plaintiff on June 24, 2016, when he saw him in follow-up after the prostate biopsy; the record indicates that Salkini spent 15 minutes out of the 25-minute visit with Plaintiff, discussing the risks and benefits of the "open vs. robotic cystolithotomy" procedure, expectations regarding the post-operative course, and giving Plaintiff time to ask questions. ECF No. 31-3 at 47.  Plaintiff's allegation that he received a 6 or 7 inch incision when he was expecting a "pin size" one is not supported by the June 27, 2016 cystolithotomy operative report, which indicates that Salkini made a "4 cm Pfannenstiel incision" above Plaintiff's pubic bone. Id. at 67.  Because four centimeters is equal to only 1.5748 inches,[16] it is apparent that Plaintiff's claim about the size of the incision is unsupported.

Despite Plaintiff's claim that his surgery was performed in a dirty cluttered room, there is no indication in the record to support Plaintiff's allegation that his surgery was performed in anything other than a standard operating room.  Even assuming the room were dirty, while highly doubtful, Plaintiff has not alleged that he suffered any harm as a result, such as a wound infection.

In his sworn affidavit, attached to his response in opposition to Dr. Salkini's dispositive motion, Plaintiff alleges that he was assured that the surgery would be a "short outpatient procedure" but that it was "an all-day surgery."  ECF No. 31-4, ¶¶ 8, 9 at 3. While there is nothing in the limited records indicating how long the surgery took, what time Plaintiff arrived in recovery

_____

[16] See CM to Inches Converter, *available at:* < https://www.inches-to-cm.com/cm-to-inches.php >

room, or how long it took him to awaken, there is no indication in the limited medical records provided that his surgery and recovery were anything other than routine.

Plaintiff's allegation that Salkini did not tell him before the surgery that he would have a Foley catheter in place afterward is completely refuted by his own sworn affidavit, which alleges that he was unaware that he was going to wake up with "a catheter attached to my private parts. None of this [was] approved or [included in] discussion prior to the all-day butcher of my organs and manhood based on some mis-guided [sic] racist believes [sic] or outright incompetency." ECF No. 31-4, ¶ 9 at 3. However, earlier in the same affidavit, he stated that during preoperative discussions, Dr. Salkini "informed me that he may have to insert a device into the head of my penis[.]" Id., ¶ 7 at 3.  Because a Foley catheter is routinely required post-operatively after this type surgery to prevent stress on the sutures till the incision in the bladder heals, it is unlikely that this was not explained to him.

As for Plaintiff's claim that malpractice occurred because he vomited in the recovery room after surgery, vomiting after general anesthesia is very common and does not rise to the level of a "post-surgery complication." Moreover, there is no evidence in the medical record to support Plaintiff's claim that a dangerous "surge" in his blood pressure occurred the evening of surgery, as further evidence of Salkini's alleged malpractice. To the contrary, the urology resident's first post-op day note of June 28, 2016, notes that Plaintiff had "no acute issues overnight. Had one episode of emesis post op yesterday, but none since.  Some heartburn. Tolerating diet. Ambulating. No fever/chills. Pain controlled . . . general: no distress . . . Abdomen: soft, non-tender, non-distended, incision c/d/i (clean, dry, intact)." Id. at 55. Moreover, even if Plaintiff's blood pressure had risen outside the norm postoperatively, his medical records indicate that had a pre-existing history of hypertension [id. at 28], which would account for it.

Plaintiff's claim that he was discharged from RMH without any further treatment or instruction on how to care for his wound or the Foley catheter, is likewise disproven by the records, which clearly demonstrate that he was provided with detailed written discharge instructions, including how to clean and care for the incision; prescriptions for the medications he was to take, including Percocet (an opiate) for pain; an order for a "fluorocystogram" to be done before his two-week follow-up visit; and specific instruction regarding who and how to call to obtain medical attention, if he developed certain symptoms or had questions or concerns.  ECF No. 31-3 at 64 – 65. Dr. Salkini's discharge instructions further note that the discharge instructions were "reviewed with the patient and all questions were answered.  He will follow-up in WVU Urology Clinic . . . in 1 week[] for fluorocystogram and possible Foley catheter removal." Id. at 65.

Next, Plaintiff alleges that prior to his two-week post-operative follow up visit, he developed an infection[17] and the Foley catheter was removed by non-hospital personnel. However, his own affidavit describes these "non-hospital personnel" as "prison untrained individuals."  ECF No. 31-4, ¶ 10 at 3. As an initial point, Dr. Salkini can hardly be faulted for the actions of BOP personnel; further, the records, quoted infra, do not support the reason Plaintiff gives for the catheter's removal.

Plaintiff's response in opposition to RMH's dispositive motion contends that when he went to the two-week follow-up visit, "a nonskilled hospital employee following Salkini's instruction . . . attempted to re-insert the catheter without the use of anesthesia," but stopped when Plaintiff became upset. ECF No. 35 at 5.  The records do not support this claim. Plaintiff's July 15, 2016 two-week post-op visit indicate that he was

---

[17] Plaintiff does not identify what type of infection he allegedly developed; given that he alleges that Foley catheter had to come out because of the infection, the undersigned presumes Plaintiff means he developed another UTI, given his history of them.

> doing well since the surgery. **His foley catheter was removed at his correctional facility on POD 9 bc it was bothering the patient**. He has had the catheter out for about 10 days now.  Therefore, he did not have his follow-up cystogram as was intended post-op . . . has been voiding well without gross hematuria, incontinence, frequency, urgency, or weak stream. **He denies any UTIs since surgery**. He rarely has any pain over his incision. Moving his bowels well.

ECF No. 31-6 at 79 (emphasis added). It is apparent, then, that the catheter was removed at Plaintiff's request, not because there was infection, and that there was no other negative symptom indicating that there was any longer a need for radiological imaging, which would typically have been done before the catheter was removed. Salkini concluded that Plaintiff was "[h]ealing well post-op.  We would have preferred he kept the foley catheter as planned with a cystogram, but the correctional facility removed the catheter. If his bladder was leaking urine[,] he would have had symptoms by now." Id. at 80.  Further, there is no mention in the records of any attempt to re-insert the Foley catheter, and indeed, given that Plaintiff had already been catheter-free for ten days and was doing well without it, there would have been no reason to do so.

Plaintiff's claims that he was discharged from care with no post-surgery x-ray or examination of his wounds is belied by the excerpt just quoted from the medical record.

As for Plaintiff's final allegation, in his responses to Salkini's and RMH's dispositive motions, that during the surgery, Salkini "deliberately or accidentally severed several nerves resulting in [Plaintiff's] impotence, back and lower leg pain [ECF No. 31 at 4, ECF No. 35 at 6]," the records do not support such a claim.  As a preliminary note, it would be preposterous for Salkini to have "deliberately" severed nerves out of some hypothetical racial animus toward Plaintff. Moreover, it would be impossible for Plaintiff to have sustained damage to the nerves that control the ability to have an erection from the cystolithotomy performed by Salkini.  That surgery created an incision *on the front* of the bladder, nowhere near the neurovascular bundle that controls erections; those nerves, as illustrated and highlighted in the diagram below, travel *behind* the

bladder. Those nerves can be damaged during prostate surgery,[18] but not in a cystolithotomy procedure.



Moreover, it is clear that on Plaintiff's July 15, 2016 post-op visit, he was healing well and reported no abnormal symptoms. While Plaintiff alleges that "Dr. Zia Abdi of Atlanta Georgia"[19] told him that "proper pre-op and post op procedures were not followed" and that Salkini "deliberately or accidentally severed several nerves" during the surgery, this is highly doubtful, given the impossibility of the same. It is notable that Plaintiff did not include any written statement from Dr. Abdi, or any other physician, opining to the same. Finally, as for Plaintiff's claim of post-cystolithotomy leg and back pain, there are no nerves on the front of the bladder that could be cut, that could cause such an injury.  Plaintiff's records indicate that he had already history of back

---

[18]   See Erectile Dysfunction Following Radical Prostatectomy, *available at*: <http://urology.jhu.edu/erectileDysfunction/erectile_dysfunctions_RP.php >

[19]  Dr. Abdi apparently is a family practice physician, not a urologist.  See Dr. Zia Abdi, *available at*: < https://www.sharecare.com/doctor/dr-zia-abdi >

problems and had back surgery in 1996 [ECF No 31-3 at 28]; the back and leg pain he now claims

to have, if it exists at all, could easily be attributable to the same.  Accordingly, this appears to be

yet another unsupported conclusory allegation.

Finally, Plaintiff's claim, in his response to Dr. Salkini's dispositive motion, that doctors

from the Social Security Administration ("SSA") determined that his impotence, back and lower

leg pain caused his "suicidal depression" and declared him disabled as a result [ECF No. 31 at 5];

Plaintiff has provided nothing from the SSA concluding that he is disabled or explaining why. Like

the rest of his claims, this appears to be merely another conclusory allegation.

While Plaintiff has attached a sworn affidavit to his "memorandum in support," attesting

to his claims, it is comprised of conclusory allegations that do not comport with the record or meet

the plausibility standard of Iqbal, permitting the undersigned to draw the reasonable inference that

any of the named defendants are liable for the misconduct alleged. Iqbal, 129 S.Ct. at 1949.  A

Court may discount "unsupported, conclusory statements" in an affidavit. Sandoval v. United

States, 2010 U.S. Dist. LEXIS 134248, *17, 2010 WL 5300818 (E.D. Va. 2010) *quoting* United

States v. Perez, 393 F.3d 457, 464 (4th Cir. 2004).

To the extent that Plaintiff may be seeking to establish a medical negligence claim, he must

comply with West Virginia law and establish that:

> (a) the health care provider failed to exercise that degree of care, skill, and learning
> required or expected of a reasonable, prudent health care provider in the profession
> or class to which the health care provider belongs acting in the same or similar
> circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff

was properly diagnosed and treated and/or whether the health care provider was the proximate

cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code § 55-7B-6. This section provides in pertinent part:

> **§ 55-7B-6**. Prerequisites for filing an action against a health care provider; procedures; sanctions.
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.
>
> (b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the Rules of Civil Procedure.

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp. 2d 805, 806-807 (N.D. W.Va. 2004).

Plaintiff argues that Salkini's and RMH's claim that the complaint should be dismissed for its failure to comply with the mandatory pre-suit requirements of the WVMPLA is a "ridiculous assertion," and an "attempt[] to use a state law to take issue with the Court's administration

40

handling of this matter," which is a federal, not a state matter, [id. at 8]; however, Plaintiff is mistaken.

The undersigned agrees with Salkini and RMH that Plaintiff's claim of nerve damage and impotence from the bladder stone removal procedure is a complex medical issue which requires that a screening certificate of merit be filed.   In Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D. W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." Id. at 858 (all spelling and punctuation errors in original).[20]

Unlike the facts in Johnson, Plaintiff's allegations of medical negligence are complex and expert testimony is necessary. See O'Neil v. United States, 2008 WL 906470 (S.D. W.Va. Mar. 31, 2008)(finding that plaintiff was not excused from filing a screening certificate of merit because the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure, and cardiomyopathy, are not within the understanding of lay jurors by resort to common knowledge and experience); see also Lancaster v. Hazelton, 2018 U.S. App. LEXIS 20836, *1 (4th Cir. Jul. 26, 2018) (per curiam) (affirming this court's dismissal of his FTCA medical negligence claims

---

[20] Johnson is a rare exception to "the general rule that in medical practice cases negligence or want of professional skill can be proved only by expert witnesses." See Banfi v. Am. Hosp. for Rehab., 529 S.E.2d 600, 605 (W.Va. 2000). A court shall require expert testimony except where the "lack of care or want of skill is so gross, so as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience…" Id. at 605-606.

for his failure to file the required screening certificate of merit, pursuant to W. Va. Code § 55-7B-6(b) prior to filing his medical negligence claim).

Expert testimony is necessary to support a finding that the medical treatment provided by Salkini and RMH fell below the applicable standard of care. The undersigned finds that the symptoms, methods of prevention, and proper treatment options for cystolithotomy are not within the understanding of lay jurors by resort to common knowledge and experience. Further, neither is the alleged causal connection in the delay of the testing and the injuries alleged.

With regard to the appropriate standard of care, Plaintiff has not sustained his burden of proof. Plaintiff does not assert, much less establish, the standard of care for his allegedly-improperly-performed bladder stone removal surgery.  Although he filed two sworn affidavits from one Nicole Farmer, *nka* Nicole Williams ("Williams") [ECF No 31-1, ECF No. 56], an LPN, after filing suit, presumably in an attempt to meet the MPLA's requirements of a screening certificate of merit, neither of them meet the standard for competency of an expert medical witness under W.Va. § 55-7B-7.

Williams describes herself as a "field nurse interim home healthcare [sic] in Atlanta[,] Georgia" with 14 years' experience in the medical field.  ECF No. 31-1 at 2; ECF No. 56 at 1. Williams' first affidavit, filed on May 18, 2018, is as full of conclusory allegations as Plaintiff's own pleadings, indicates a complete misunderstanding of the physiology of impotence and the surgery that Salkini performed, and does not even include a statement that Williams reviewed Plaintiff's medical records. Given her unfounded allegations regarding Dr. Salkini, and possibly also RMH as having not followed "basic ethics;" not having included Plaintiff in his own plan of care; not having provided Plaintiff with discharge instructions identifying the post-op signs, symptoms, and complications to watch for and report, it is apparent that she did not review the

42

records. See ECF No. 31-1 at 3. Moreover, her allegation that Salkini did not "complete post op diagnostics" on Brown, to ensure that all stones were removed [id.] further indicates that she was unaware of the very reasonable explanation for the cystogram being omitted, contained in the medical records and explained *supra*. Further, her allegation that Salkini failed to "biopsy" the stones that were removed indicates that she is also unaware that Plaintiff's medical records include a lab report on the analysis of the stones' composition. See ECF No. 31-6 at 72.

Williams also accuses Salkini of having failed to "provide etiology and treatment of a preventative nature" to Plaintiff, which she alleges "resulted in further damage urinary tract [sic] because of lack of proper education and testing which created reoccurrence and non-treatment of urinary tract infection which can cause permeant [sic] kidney damage and urethral narrowing which creates more difficulty." ECF No. 31-1 at 3. It would appear that here, Williams was attempting to refer to the etiology of the stone formation, which is apparent from the record that Salkini was well aware of, given that bladder stones most commonly form when there is bladder outlet obstruction from an enlarged prostate like Plaintiff's, and which Salkini successfully treated with Flomax, quickly relieving most of Plaintiff's BPH symptoms. See ECF No. 31-3 at 9, 12.

Further, Williams alleges that after Plaintiff's surgery, "doctors from . . . [RMH]," presumably including Dr. Salkini, gave Plaintiff

> little to no information regarding condition side effect or preventative maintenance nor signs or symptoms to report include care of Foley catheter in home environment.  Which results as negligence on part of physician to inform and educate patient on procedures, to provide adequate diagnostics after procedure, to provide an adequate plan of care to be followed by clinicians including Foley Cath removal and care that cared for Brown's following procedure which results in further neurological damage creating a total disregard to meet Brown's psychosocial needs.

Id. (all punctuation and grammatical errors included).  It is unclear from this statement whether Williams is attempting to imply that the removal of the Foley catheter by prison personnel, which

43

was apparently done at Plaintiff's own request, caused some sort of unspecified "neurological damage."  To the extent that she was intending to allege this, as noted *supra*, not only is such a thing not anatomically possible, there is simply no proof in the medical records to support it.  This statement further confirms that not only does Williams not understand basic anatomy and physiology or the procedure she holds herself out as an expert on, she did not even review the available records, which show that Salkini discussed the surgery extensively with Plaintiff on more than one occasion, explaining the different surgical approaches, their risks and benefits and expected post-operative course, and provided detailed discharge instructions afterward.

Williams' second affidavit, filed on July 9, 2018, still does not aver that she read Plaintiff's relevant medical records and it is clear from her affidavit that she has not. Nonetheless, she now alleges that she reviewed the "Post-Operative Patient Care, Voice Care and Transitional Care Planning procedures sent to Mr. Brown on June 12, 2018"[21] and has concluded that "West Virginia University Hospitals employees, partners and or agents were negligent and committed medical malpractice in caring for Mr. Brown's medical needs by failing to follow both the medical professional norms and West Virginia University's own standard post-medical procedures."  ECF No. 56 at 2. She attaches copies of these three documents, which appear to be internal WVU Hospital procedure outlines, intended for hospital nursing staff. One is titled "Post-Operative Patient Care," and is a list of general, routine nursing care measures to be used in caring for unspecified post-operative patients [ECF No. 56-1 at 1 - 2]; the next is a "Voice Care" instruction, which explains what is apparently an internal protocol at WVU Hospitals for nurses to communicate with other nurses via recorded phone messages; [id. at 3 – 4]; and the third is titled "Transitional Care Planning." Id. at 5.  It appears to outline the procedure for registered nurses to

---

[21] It would appear that Plaintiff or Ms. Williams herself requested copies of these documents, because none of these are documents that would typically be provided to patients.

assess, plan, implement, and coordinate patient care on admission and throughout their entire stay through discharge, to achieve interdisciplinary continuity of care.  Williams does not even attempt to explain the relevance of any of the three documents. The only thing contained in any of the three that she attempts to rely on, to identify how the RMH staff allegedly deviated from procedure, is item #12 on the "Post-Operative Patient Care" outline, which specifies "[c]heck for patient voiding for first eight hours or as ordered." ECF No. 56-1 at 1.  She seizes on this as proof of malpractice, stating "[i]n Mr. Brown's case, this was not performed as the catheter was never removed therefore never establishing Brown's ability to void on his own." ECF No. 56 at 3. She deems it "neglect" that he was sent back to the prison with his catheter still in place, and alleges that because the hospital "still accepted funds as though all care was given per standard . . . [t]his is fraud." Id. She then makes a quantum leap in logic, concluding that this unequal treatment was meted out to Plaintiff because he was "African-American." Id. It is woefully apparent that Williams has not read Plaintiff's medical records, nor has she, despite her touted "expert" status, performed even the barest "Google" search on cystolithotomy, which would have informed her that the Foley catheter is routinely left in place for 7 – 10 days after surgery to keep the bladder empty, to prevent stress on the sutures while the bladder incision heals.

Likewise, Williams' allegation that Plaintiff "was given little to no information regarding potential side effects or preventive medical maintenance nor signs or symptoms to report to include care of Foley catheter in the outer hospital environment [ECF No. 56, ¶ 6 at 2] (all grammatical and punctuation errors in original) again reveals that she has not read the records and is unaware that Plaintiff did in fact receive detailed written discharge instructions.  She alleges that "during my examination of Mr. Brown, I found that he is now impotent and . . . in frequent pain . . . [with] burning and tingling sensation during urination . . . [and] intermittent numbness in his lower

extremity particularly in his right hip, legs and groin area . . . [and] sharp intermittent pain to his flank back and abdomen area . . . worse in the evening which is consistent with pains associated with the presence of more bladder stones as they travel through Brown's urinary tract." Id., ¶ 4 at 2. Inexplicably, after all this, she concludes that it is her "professional opinion that the physician/hospital demonstrated extreme negligence and lack of empathy related to discrimination based on race and inmate status." Id. at 2.

The undersigned notes that it has been approximately two and a half years since Salkini performed his bladder stone removal; whether Plaintiff has developed further bladder stones, kidney stones, or new health problems altogether, that would account for his claimed symptoms since then is unknown. There is nothing in the record documenting Plaintiff's medical status past his July 15, 2016 post-operative visit with Salkini, which demonstrated that he was doing well and had little pain and no negative symptoms. Williams' conclusory allegations that Plaintiff has complications from malpractice appear to be unsupported by anything more than her own uninformed opinion.  Further, she has presented nothing to demonstrate that either Salkini or RMH exhibited "extreme negligence and lack of empathy related to discrimination based on race and inmate status."

In Mayhorn v. Logan Medical Foundation, 193 W.Va. 42, 454 S.E.2d 87 (1994), the West Virginia Supreme Court of Appeals ("WVSCA") held that Rule 702 of the West Virginia Rules of Evidence ("Rule 702") is "the paramount authority for determining whether or not an expert is qualified to give an opinion." Mayhorn, 193 W.Va. 42 at 49.

Rule 702 states: "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion

or otherwise." The essence of Rule 702 is that of assisting the fact finder's comprehension through expert testimony. Sheely v. Pinion, 200 W.Va. 472, 478, 490 S.E.2d 291, 297 (1997).

In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a . . . court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify. Syl. Pt. 5, Gentry v. Magnum, 195 W.Va. 512, 466 S.E.2d 171 (1995).

West Virginia Code § 55-7B-7 addresses the competency of witnesses in medical malpractice cases. In its previous iteration, W.Va. Code § 55-7B-7 provided:

> The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. Such expert testimony may only be admitted in evidence if the foundation, therefor, is first laid establishing that: (a) the opinion is actually held by the expert witness (b) the opinion can be testified to with reasonable medical probability; (c) such expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (3) such expert maintains a current license to practice medicine in one of the states of the United States; and (e) **such expert is engaged or qualified in the same or substantially similar medical field as the defendant health care provider**.

W.Va. Code § 55-7B-7 (1986) (emphasis added).

In 2003, W.Va. Code § 55-7B-7 was amended to read in pertinent part:

> (a) The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. A proposed expert witness may only be found competent to testify if the foundation for his or her testimony is first laid establishing that: (1) The opinion is actually held by the expert witness; (2) the opinion can be testified to with reasonable medical probability; (3) **the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is**

addressed; (4) **the expert witness's opinion is grounded on scientifically valid peer-reviewed studies if available**; (5) **the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States**: Provided, that the expert witness's license has not been revoked or suspended in the past year in any state; and (6) **the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient**. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert. The parties shall have the opportunity to impeach any witness's qualifications as an expert. Financial records of an expert witness are not discoverable or relevant to prove the amount of time the expert witness spends in active practice or teaching in his or her medical field unless good cause can be shown to the court.

W.Va. Code § 55-7B-7(a) (emphasis added).

Accordingly, it is apparent that it is no longer a requirement that a proffered expert witness in a medical malpractice action be engaged or qualified in the same or substantially similar medical field as the defendant health care provider. It is only required that the proposed witness be familiar with the standard of care alleged to have been breached. Fitzgerald v. Manning, 679 F.2d 341 (4th Cir. 1982). However, although a medical expert, otherwise qualified, is not barred from testifying merely because he or she is not engaged in practice as a specialist in the field about which his or her testimony is offered . . . it is clear that a medical expert may not testify about any medical subject without limitation. Gilman v. Choi, 185 W.Va. 177, 181, 406 S.E.2d 200, 204 (1990) (*overruled on other grounds as stated in* Mayhorn v. Logan Medical Foundation, 193 W.Va. 42, 49, 454 S.E.2d 87 (1994)). "The salient inquiry is to what extent the physician witness is qualified to testify as an expert on the issue of a medical malpractice defendant's standard of care in treating a patient suffering a condition equivalent to the plaintiff's." Fortney v. Al-Hajj, 188 W.Va. 588, 425 S.E.2d 264 (W.Va. 1992). Further, a medical malpractice plaintiff must prove that the defendant specialist failed to meet the standard of care required of physicians in the same specialty

48

practiced by the defendant; and to qualify a witness as an expert on that standard of care, the party offering the witness must establish that the witness has more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty. <u>Gilman v. Choi</u>, 185 W.Va. at 181.

It is well established that the training and specialization of a physician expert witness in a medical malpractice case goes to the weight rather than to the admissibility of the testimony. <u>Frost v. Mayo Clinic</u>, 304 F. Supp. 285 (D. Minn. 1969); <u>see also</u> <u>Gentry v. Mangum</u>, 195 W.V. 512, 527, 466 S.E.2d 171, 186 (1995). While there is no dearth of case law to show that under certain circumstances, a physician from one specialty may opine as to the breach of the standard of care of a physician from another specialty,[22] where a physician from one specialty cannot demonstrate the requisite training, experience, or familiarity with the standard of care applicable to that of the defendant physician, such testimony is barred.[23]

---

[22] <u>Dolen v. St. Mary's Hosp., Inc.</u>, 203 W. Va. 181, 506 S.E.2d 624 (1998) (*per curiam*) (plaintiff's oral surgeon expert qualified under Rule 702 to render expert testimony regarding the negligence of the defendant emergency room ("E.R.") doctor's and radiologist's negligence in their treatment of plaintiff's broken jaw, because the oral surgeon (a) had substantial educational and experiential qualifications relating to jaw fractures; (b) his field of expertise was relevant to the diagnosis by panorex X-ray films of patient's jaw and the treatment of jaw fractures; and (c) this expertise would assist the trier of fact); <u>Gilman v. Choi</u>, 185 W. Va. 177, 406 S.E.2d 200 (W. Va. 1990) (testimony of plaintiff's proffered expert, a board certified orthopedic surgeon, not barred merely because he was not certified in the same specialty as defendant physicians, an internist and an E.R. physician, where plaintiff's orthopedic surgeon expert testified as to standard of care for an internist or E.R. doctor regarding whether their allegedly negligent treatment necessitated plaintiff's total hip replacement); <u>Mayhorn v. Logan Medical Found.</u>, 193 W. Va. 42, 454 S.E.2d 87 (1994) (testimony of plaintiff's expert, a board certified internist and professor of cardiology with specific knowledge about the preventable arrhythmia caused by the acute myocardial ischemic condition at issue; history of eight years' full-time employment in an E.R. and continued E.R. work on an as-needed basis when he was called in to see patients in the E.R. for cardiology problems, should have qualified, even though it conflicted with opinion as to cause of death offered by defendant hospital's pathologist); <u>Fortney v. Al-Hajj</u>, 188 W. Va. 588, 188 W. Va. 588, 425 S.E.2d 264 (W. Va. 1992) (general surgeon allowed to testify as plaintiff's expert against an E.R. physician because the surgeon had vast experience in handling cases of food impacted in patients' throats, the issue at hand).

[23] <u>See</u>, e.g., In <u>Kiser v. Caudill</u>, 210 W.Va. 191, 557 S.E.2d 245 (2001) (*per curiam*) ("Kiser 1"), a medical malpractice case with an even longer and more tortured history than the instant one, plaintiff's expert neurologist was not qualified to render an opinion as to the applicable standard of care required of the defendant neurosurgeon); on appeal for the second time in <u>Kiser v. Caudill</u>, 215 W.Va. 403, 599 S.E.2d 826 (2004) ("Kiser 2"), the WVSCA held that despite the fact that Kiser's remaining expert, a board-certified neurosurgeon who had devoted the first fifteen years of his clinical practice to pediatric neurosurgery and had personally performed two to five neurosurgical procedures to untether spinal cords, including cords fixed to a lipoma, like plaintiff's, was not qualified to testify because he had no more than a casual familiarity with the applicable standard of care; was not an expert on tethered spinal cords; had never

Further, "cross-discipline" testimony, where an expert medical provider from one discipline is permitted to opine as to the standard of care of a medical provider from an entirely different discipline, is necessarily even more strictly limited. Only in those cases in which the proffered expert is able to demonstrate the knowledge and experience necessary to render an expert opinion and does not exceed the scope of his or her expertise by addressing the issues of causation is such testimony permitted. The exception to this general rule arises whenever the methods of treating a particular ailment are generally the same in either school. See Creasey v. Hogan, 48 Ore. App. 683, 690, 617 P.2d 1377, 1380 (1980) (plaintiff's orthopedic surgeon expert permitted to offer opinion against defendant podiatrist, because both performed bunionectomies, the surgery at issue). See also Creekmore v. Maryview Hosp., 662 F.3d 686 (4th Cir. 2011) (OB-GYN doctor permitted to testify as an expert regarding the standard of care for a nurse's postpartum monitoring of a high-risk pre-eclamptic patient, because the OB-GYN was qualified to testify as an expert in the standard of care under Virginia law, and the OB-GYN performed the same postpartum monitoring of high-risk pre-eclamptic patients in the same context in which it was alleged that the hospital and its nurses deviated from the standard of care).

---

written on the subject nor performed any scientific studies on the same; and could not cite to any medical textbooks or literature to support his opinions regarding tethered spinal cord diagnosis and treatment in 1973); Connelly v. Kortz, 689 P.2d 728, 729-30 (Col. Ct. App. 1984) (internal medicine specialist with only casual familiarity with standards of care for general surgeons was not qualified to testify against general surgeon as to proper indications for surgery); Greene v. Thomas, 662 P.2d 491, 493-94 (Col. Ct. App. 1982) (plaintiff's dermatologist was not qualified to testify as to standard of care for plastic surgeons, where dermatologist had only casual familiarity with plastic surgery procedure at issue), cert. denied (Colo. May 2, 1983); Wielgus v. Lopez, 525 N.E.2d 1272, 1274 (Ind. Ct. App. 19883) (testimony of plaintiff's expert anesthesiologist was excluded because he was not familiar with surgical standard of care for defendant surgeon); Syl. pt. 2, Swanson v. Chatterton, 281 Minn. 129, 160 N.W.2d 662 (1968) (testimony of plaintiff's medical expert against defendant orthopedic surgeon was excluded, even though he was chief of medical staff at a large hospital and a specialist in internal medicine, because he had little or no experience with the orthopedic surgery at issue and no familiarity with same, except for general learning in medical school fifteen years earlier).

The Fourth Circuit Court of Appeals has held that

> The knowledge requirement does not demand an identical level of education or degree of specialization; rather, it can be shown by evidence that the standard of care, as it relates to the alleged negligent act or treatment, is the same for the proffered expert's specialty as it is for the defendant doctor's specialty. Thus, the inquiry focuses on the expert's knowledge of, and experience with, the specific procedure at issue, not on the expert's professional qualifications relative to those of the defendant practitioner.

Creekmore v. Maryview Hosp., 662 F.3d 686, 691 (4th Cir. 2011). However, where proffered experts from one specialty are *not* found to demonstrate the requisite knowledge, training, experience and familiarity with the applicable standard of care necessary to testify as experts against a defendant from another specialty, such testimony is barred.[24]

---

[24] See Short v. Appalachian OH-9, Inc., 203 W. Va. 246, 507 S.E.2d 124 (1998) (plaintiff's experts, a neonatal intensive care nurse and two witnesses knowledgeable and experienced in emergency medical services not qualified to testify that infant's death was proximately caused by any actions of the ambulance personnel, because the expertise of a physician was needed); Estate of Hezekiah Harvey v. Roanoke City Sheriff's Office, 585 F. Supp. 2d 844 (W.D. Va. 2008) (plaintiff's expert, a licensed clinical psychologist who practiced exclusively in the state of Oregon, not qualified to testify regarding the applicable standard of care for defendant physicians because he was not a medical doctor or a nurse; was not licensed to practice psychology or any medical specialty in Virginia; had received no formal training in Virginia or any training regarding the provision of medical or mental health services in a correctional setting; and because he was not a medical doctor, he was not qualified to render an expert opinion on the issue of proximate cause of death of agitated psychotic pretrial detainee while in custody); Taplin v. Lupin, 700 So. 2d 1160; 1997 La. App. LEXIS 2400; 97-1058 (La. App 4 Cir. 10/01/97) (Registered nurse was not an expert when it came to the standard of care a doctor owed a patient and was not competent to opine as to whether the standard was breached or whether the breach caused the patient's injuries); Peck v. Tegtmeyer, 834 F.Supp. 903 (W.D. Va. Oct. 7, 1992) (radiation physicist not qualified to testify as to the standard of care for a radiologist, because he never had a radiological clinical practice; admitted that he did not "get involved with the patient;" radiation physics is not a field of medicine at all, let alone a "related field of medicine" to radiology, because a career in radiation physics, like the expert's, required no medical training. Even if radiation physics could be considered a "related field of medicine," the expert had never had what could be called a "clinical practice" in radiation physics). Likewise, in Taormina v. Goodman, 63 A.D.2d 1018, 406 N.Y.S.2d 350 (1978), the testimony of a medical doctor was offered as an expert against a defendant chiropractor. The New York court held that because a medical doctor was not a member of the chiropractic discipline, the doctor was not competent to testify to the alleged malpractice of a chiropractor. Taormina, 406 NY.S.2d at 351-52. The Taormina court's rationale is significant:

> To recover damages predicated upon the malpractice of a chiropractor, plaintiffs' proof at the trial did not include the testimony of any chiropractic experts, but rather medical doctors, whose knowledge of chiropractics was admittedly quite limited. The testimony of these doctors only served to establish defendant's deviation from a medical standard of care in his treatment of the plaintiff. Accordingly, there was no competent trial evidence upon which the jury could have predicated its finding . . . that defendant had failed to exercise 'that degree of care that a reasonably prudent chiropractor would exercise under the circumstances.' "Under present New York law, the practice of chiropractic is separate and distinct from the practice of medicine . . . so that a physician's standard of care can no longer be considered controlling upon a chiropractor in the practice of his profession.

Here, Plaintiff's purported "expert" Williams is an LPN in Atlanta, Georgia. Licensed practical nurses can obtain licensure after one full time year of college.[25] Williams has not even provided a copy of her *curriculum vitae* to prove she has active licensure. She has not demonstrated that she has the requisite knowledge, training, experience and familiarity with the applicable standard of care necessary to testify as an expert against a defendant from another specialty, to meet the requirements of W.Va. § 55-7B-7.  To the contrary, her two affidavits make it clear that she does not even understand the anatomy and physiology of erectile dysfunction/impotence, the procedure Plaintiff underwent, or the applicable standard of care; it is apparent she did not review the records but based her opinion wholly on Plaintiff's own conclusory allegations and three documents regarding internal hospital procedure that have no bearing on the matter at issue. Accordingly, she is not competent to render an opinion as to whether the Salkini and RMH, a medical doctor and a hospital, respectively, breached the applicable standard of care in their treatment of Plaintiff's bladder stones and cystolithotomy.

Because this is not a case of alleged malpractice so obvious that it entitles Plaintiff to the common knowledge exception of W.Va. Code § 55-7B-6(c), Plaintiff is not excused from filing a

---

Id. at 352. See also Morgan v. Hill, 663 S.W.2d 232, 234 (Ky. Ct. App. 1984) (physician was ruled incompetent to testify as to the standard of care of chiropractor); Johnson v. Lawrence, 720 S.W.2d 50, 54-55 (Tenn. Ct. App. 1986) (testimony of medical doctors not competent to prove the standard of care required of chiropractors); Maxwell v. McCaffrey, 219 Va. 909, 913, 252 S.E.2d 342, 345 (1979) (orthopedic surgeon not permitted to testify regarding standard of care required of a chiropractor); Broderson v. Sioux Valley Memorial Hosp., 902 F. Supp. 931, (N.D. Iowa 1995) (three medical doctors not qualified to testify as to the standard of care required of a chiropractor); Jacobs v. United States, 2016 U.S. Dist. LEXIS 120362, * 9 - *10, 2016 WL 4661120 (N.D. W.Va. 2016) (South Carolina licensed chiropractor not qualified to opine on the applicable orthopedic standard of care required to prove a medical negligence claim under West Virginia law against a physician and a physician's assistant).

[25] Most practical nursing programs are designed to be completed in one to two years, depending on whether a student attends classes on a full- or part-time basis. See Becoming an LPN in West Virginia, available at < https://www.practicalnursing.org/lpn-programs/west-virginia >

screening certificate of merit pursuant to West Virginia Code § 55–7B–6(c) and his medical negligence claim against these two defendants should be dismissed.

## F. <u>Bad Faith Claim Against RMH</u>

In his response in opposition to Dr. Salkini's motion to dismiss, for the first time, Plaintiff appears to raise a "bad faith" claim against RMH for its failure to respond to his FOIA requests for certain records.

More specifically, Plaintiff's attached copy of an April 10, 2018 FOIA request letter from him to the RMH Medical Records department, requested "copies of all **public** records that show and describe[] the outcome of kidney stone [sic] removal proceedings perform[ed]by Dr[.] Mohamad Salkini on a racial base . . . [copies of] all disciplinary action taken against Dr. Salkini over the last ten years and any [and] all racial complaints filed against same doctor and RMH over the same period (last ten-year)." ECF No. 31-2 at 2 (emphasis added).

Setting aside for the moment that Plaintiff's April 10, 2018 FOIA request, the basis of his bad faith claim against RMH, was included in his response in opposition to *Dr. Salkini's* dispositive motion, and not in his response in opposition to RMH's dispositive motion, Plaintiff's FOIA request letter was addressed to the medical records department at RMH and sought "previously undisclosed documentation of systemic racism and racial bias, medical malpractice, and discrimination," records that would never be found in a medical records department, if they exist at all.  Further, Salkini, not being an employee of the hospital, has no control over its medical records department.  Moreover, Plaintiff's specific FOIA request to a hospital medical records department for "copies of all **public** records that show and describe[] the outcome of kidney stone [sic] removal proceedings perform[ed]by Dr[.] Mohamad Salkini" is a request for records that simply do not exist, because medical records are by definition confidential, not "public," and Dr.

Salkini removed *bladder* stones from Plaintiff, not kidney stones. Finally, Plaintiff's "bad faith" claim was raised for the first time in response to a motion to dismiss and was not included in his complaint.

As previously noted, when deciding a Rule 12(b)(6) motion to dismiss, the district court is limited to the allegations set forth in the complaint. Kennedy v. Chase Manhattan Bank, 369 F.3d at 839. Had Plaintiff wished to add this claim against RMH to his pleadings, he could have done so via a motion seeking leave to amend his complaint.  However, even if this assertion regarding "bad faith" were properly before the court, the facts alleged do not support an inference that either Salkini or RMH committed bad faith.

## G. Service of Process

As their final basis for their motions to dismiss, both Salkini and RMH contend they were not properly served the claims against them should be dismissed pursuant to Fed.R.Civ. P. Rules 12(b)(2), 12(b)(4), and 12(b)(5). They note that the complaint was filed on August 17, 2017, but summonses and copies of the complaint were not served on them until April 6, 2018, a period of 232 days, well outside the 90-day period prescribed by Fed.C.P.R. 4(m) for service of process. Accordingly, Salkini and RMH both argue that because Plaintiff failed to timely serve his Summons and Complaint, no jurisdiction was established over them and the claims against them should be dismissed.

Fed.R.Civ.P. 12(b)(2) "provides for dismissal where the court lacks personal jurisdiction over a particular named defendant." Miller v. Rutherford County, 2008 U.S. Dist. LEXIS 102779, * 4, Howell, D.L. (W.D.N.C. Dec. 1, 2008) adopted by Miller v. Rutherford County, 2008 U.S. Dist. LEXIS 102775, Thornburg, L.H. (W.D.N.C. Dec. 19, 2008).

Rule 4(e) of the FRCP sets forth the procedure for accomplishing service on individuals within a judicial district of the United States:

> Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served in a judicial district of the United States by:
>     (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or
>     (2) doing any of the following:
>     (A) delivering a copy of the summons and of the complaint to the individual personally;
>     (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
>     (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed.R.Civ.P Rule 4m provides as follows:

> If a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.

In the instant case, on August 22, 2017, the Plaintiff was granted leave to proceed *in forma pauperis*. Accordingly, on April 3, 2018, the USMS was directed to serve the defendants. ECF No. 8. The Process Receipt and Return for both Salkini and RMH were returned on April 24, 2018. ECF Nos. 20, 21. The Process Receipt and Return for Dr. Salkini indicates that the Deputy Marshal personally served "Jane Lightfoot," the "VP of physician's office." ECF No. 20 at 2. The Process Receipt and Return for RMH indicates that the Deputy Marshal personally served "'Chris' at WVU Hospital Legal Services" on April 6, 2018. ECF No. 21 at 2. However, service on each of these defendants was accomplished by delivering the documents to others, presumably "a person of suitable age and discretion then residing in defendant's usual place of abode." See ECF Nos. 20 at 2, 21 at 2.

Clearly, neither Salkini's professional office nor the WVU Hospital Legal Services are the usual place of abode for either Salkini or RMH; further, while it is arguable whether Jane Lightfoot is an agent authorized by appointment or law to receive service of process for Salkini, it is presumed that "Chris" in WVU Hospital Legal Services is such an agent.

Nonetheless, it is clear that neither Salkini nor RMH were served within 90 days of the filing of the complaint. However, the undersigned believes it would be inappropriate to grant Salkini's and RMH's Motions to Dismiss on the basis of insufficient service of process, in light of the fact that the *pro se* Plaintiff in this case is indigent and had no control over the USMS. Moreover, the undersigned does not find that either Salkini or RMH has been prejudiced by the delay, given that both were able to file timely responses on the merits. Therefore, the undersigned recommends that Salkini and RMH's motions to dismiss on this basis be denied as moot.

**H. Motion for Default Judgment (ECF No. 39)**

On June 4, 2018, Plaintiff filed a Motion for Default Judgment, alleging that because the Defendants DOJ, Inch, and Von Blanckensee had failed to file an Answer to the complaint, he was entitled to default judgment against them. He contends that the Court's April 3, 2018 Order to Answer, directed these three Defendants to file their Answer within thirty days [sic], and that they had failed to do so. ECF No. 39-1 at 4.

He attached an affidavit in support, alleging that "all of the named defendants in this matter" conspired together to violate his constitutional rights. ECF No. 39-4 at 2. Next, he alleged that "*all of the defendants worked in some form of [sic] other as a prison official* and have actual knowledge of my serious medical needs and knew that I could not obtain medical treatment on my own without the assistance of prison authorities." Id. (emphasis added). He then listed a litany of complaints, alleging generally that "all of [the] named defendant[s]" were aware of systemic

racism and bias at FCI Morgantown but did nothing about it, which was proof of deliberate indifference. Id. He was denied adequate medical care for over four years; he does not allege by whom.  Id. at 3. White inmates are treated preferentially at FCI Morgantown; he was physically and mentally abused there; conditions of confinement in FCI Morgantown's "hole" were deplorable; prison officials stole money from his inmate trust account; and he was subjected to "bogus write ups." Id. Further, he alleged that the BOP is a "criminal enterprise" whose members engage in "extortion, beating of prisoners, rapes, murders, systemic racism and racial bias while operating under the color of law." Id. at 4.

Rule 55(a) of the Federal Rules of Civil Procedure governs the entry of default. The rule provides:

> (a) Entering a Default. When a party against whom a judgment for affirmative relief is  sought has failed to plead or otherwise defend, and that failure is shown by affidavit  or otherwise, the clerk must enter the party's default.

Fed.R.Civ.P. 55(a).

While Plaintiff's motion is titled as one for a default judgment, pursuant to Rule 55(b)(2), once default is established, default judgment must be applied for and proved to be appropriate by Plaintiff, because this is not a matter involving a sum certain.

Here, review of the record establishes that an Order to Answer was entered on April 3, 2018; however, while that Order directed the US Marshals to *serve* the defendants within thirty days, it  afforded the Defendants DOJ, Inch, and Von Blanckensee *sixty* days in which to file their answer. ECF No. 8 at 2 – 3.  The Order to Answer also gave Plaintiff an additional thirty days to identify the John/Jane Doe defendants originally identified as "various named and unnamed BOP employees." Id. at 1 – 2.

On April 19 and 20, 2018, Plaintiff filed responses identifying the previously-unnamed Defendants. On May 3, 2018, a second Order to Answer was issued to the remaining newly-identified Federal Defendants.  On June 6, 2018, the Federal Defendants filed a Motion to Substitute Defendants and Clarify Electronic docket to correct misspellings in several of their names, as provided by Plaintiff. By Order entered June 7, 2018, the motion was granted.

The executed summonses for Defendants DOJ, Inch, and Von Blanckensee indicate that they were served on April 9, 2018.  See ECF Nos. 18, 19, 22. Accordingly, at the earliest, their answers were due on Friday, June 8, 2018. Defendants DOJ, Inch, and Von Blanckensee, along with the other Federal Defendants, electronically filed their Motion to Dismiss on Monday, June 11, 2018.  Accordingly, at the time Plaintiff filed his June 4, 2018 Motion for Default Judgment, these three Defendants' responses were not even due yet, and therefore, Plaintiff's Motion should be denied.

## V. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that: Defendant Salkini's Motion to Dismiss [ECF No. 12] be **GRANTED**; Defendant RMH's Motion to Dismiss [ECF No. 23] be **GRANTED**; and that the Federal Defendant's Motion to Dismiss [ECF No. 43], construed herein as a Motion for Summary Judgment, be **GRANTED**, and that Plaintiff's complaint be **DENIED and DISMISSED with prejudice** for failure to state a claim upon which relief can be granted under  28 U.S.C. § 1915(e)(2)(B)(ii).

Further, the undersigned recommends that Plaintiff's pending Motion for Default Judgment [ECF No. 39]; Motion for Leave to File a Motion to Strike Defendant[] [Salkini's] Reply Brief to the Plaintiff's Response Motion, and Plaintiff's Response to Defendant's Reply Motion

[ECF No. 44]; and Motion for Reconsideration of the Court's June 19 and June 25, 2018 Orders [ECF No. 55] all be **DENIED as moot.**

 **Within fourteen (14) days** after being served with a copy of the Report and Recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the recommendation to which objections are made. Objections shall identify each portion of the magistrate judge's recommended disposition that is being challenged and shall specify the basis for each objection.  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.  A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

 The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, at his last known address as reflected on the docket, and to transmit a copy electronically to all counsel of record.

 Further, upon entry of this Report and Recommendation, the Clerk is **DIRECTED** to terminate the Magistrate Judge association with this case.

DATED: January 23, 2019

      /s/ *Michael John Aloi*
      MICHAEL JOHN ALOI
      UNITED STATES MAGISTRATE JUDGE